**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMON CAUSE OF PENNSYLVANIA, | : | |
| et al., | : | Civil Action No. 1:05-CV-2036 |
| | : | |
|     Plaintiffs | : | (Judge Kane) |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| et al., | : | |
| | : | |
|     Defendants | : | |

**MEMORANDUM**

**I.      Introduction**

Plaintiffs Common Cause of Pennsylvania, the League of Women Voters of Pennsylvania, Representative Greg Vitali, and four individual citizens of the Commonwealth of Pennsylvania, seek to invoke the jurisdiction of the federal courts to address alleged legislative misconduct by state officials that they claim resulted in constitutional violations.  The Complaint, as amended on October 31, 2005, and again on February 8, 2006, alleges that the leadership of Pennsylvania's General Assembly, together with the Governor and the Chief Justice of the Pennsylvania Supreme Court, conspired to violate Plaintiffs' constitutional rights by adopting and approving –  in a manner that foreclosed public comment, full participation of all elected representatives, and honest judicial review – legislation providing substantial pay increases for the members of the General Assembly, the judiciary, and senior members of the executive branch of state government.

Plaintiffs ask that this Court declare that the Act of July 7, 2005, P.L. 201, No. 44 ("Act 44"), which was repealed on November 16, 2005, is unconstitutional and unenforceable, and

declare that the process by which the Act was passed violated the United States Constitution.

Additionally, Plaintiffs seek extraordinary and unprecedented declaratory and injunctive relief in

the form of orders enjoining the Pennsylvania General Assembly from enacting hypothetically

unconstitutional future legislation and enjoining the Pennsylvania Supreme Court from citing or

relying on certain legal precedents established by that Court since 1999.

Defendants have separately moved to dismiss this action in its entirety, arguing, inter alia,

that the matter as framed is not properly before this Court, and, in essence, that the relief sought

cannot be granted without running afoul of fundamental principles of our republican form of

government and the most basic legal tenets regarding justiciability of claims.  Plaintiffs

submitted a timely brief in opposition to Defendants' motions, and the Court heard oral argument

from the parties on May 19, 2006.  For the reasons explained fully below, Defendants' Motions

to Dismiss must be granted.

## II.    Background

For purposes of adjudicating the pending motions to dismiss, the Court is legally bound

to accept as true all well-pleaded factual allegations set forth in the Second Amended

Complaint.[1]   The Court notes that none of Plaintiffs' factual allegations have been tested in

---

[1]      Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of claims that
fail to assert a basis upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In the context of
a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual
allegations in the complaint and all reasonable inferences that can be drawn therefrom.  Langford
v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (citing Nami v. Fauver, 82 F.3d 63, 65
(3d Cir. 1996)).  Although the court is generally limited in its review to the face of the complaint,
it "may also consider matters of public record, orders, exhibits attached to the complaint and
items appearing in the record of the case."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38
F.3d 1380, 1384 n.2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d
1410, 1426 (3d Cir. 1997).

Court, and are accepted at this time only for purposes of evaluating the pending motions to dismiss.  At this stage of the proceedings, the Court must determine whether, if the facts as alleged are proved, Plaintiffs are entitled to the relief sought.  Nevertheless, because allegations that public officials abrogated their oaths of office and engaged in base self-dealing undermine public confidence in our system of laws and subject officials to serious repercussions, the Court underscores that Plaintiffs' allegations are simply that – allegations.  Accordingly, the following factual background is as alleged by Plaintiffs.

As noted, Plaintiffs' initial complaint was in the nature of a challenge to the constitutionality of a state statute, a matter routinely entrusted to our federal courts.  Within weeks of Plaintiffs' challenge, the offending statute was repealed as a result of political processes, inviting the obvious question of whether there is anything left for this Court to decide.  Following repeal of Act 44, Plaintiffs sought and were granted leave of court to amend, without objection from Defendants.  Plaintiffs did so, broadening their claims to encompass the events that immediately preceded the legislative enactment.  Now the keystone of Plaintiffs' complaint is the representation that in passing the pay raise for its members and for executive and judicial officials, the leaders of the Pennsylvania General Assembly acted in a manner that was so "unsavory" as to rise to the level of a constitutional violation that cannot go unaddressed, irrespective of the ultimate fate of Act 44.  (Second Am. Compl. at 2-4.)  Plaintiffs claim violation of due process, free speech and equal protection.

The Complaint, as twice amended, is an aggressive indictment of state government in Pennsylvania, containing shocking accusations that the House and Senate leadership, the

3

Governor,[2] and the Chief Justice of the Supreme Court of Pennsylvania acted in concert to pass, sign, and validate, ill-conceived legislation, in a manner that foreclosed public debate and independent judicial review, all in violation of Plaintiffs' rights to free speech, due process, and equal protection.  As factual support, Plaintiffs allege that unnamed justices[3] of the Supreme Court of Pennsylvania have in the past traded judicial votes for legislative votes, with members of Pennsylvania's high court agreeing to cast favorable votes on important cases pending before the court in exchange for the legislature agreeing to fund the Commonwealth's Unified Judicial System.  Specifically, Plaintiffs allege that in or around 1999 an unnamed justice or justices of the Pennsylvania Supreme Court negotiated with unnamed members of Pennsylvania's General Assembly to secure "legislation desired by the Court in exchange for rulings favorable to the legislative leadership on cases then pending before the Court challenging the constitutionality of the process by which important legislation was consistently enacted in secret."  (Second Am. Compl. at 5.)  Plaintiffs further offer their belief that unnamed justices of the Pennsylvania Supreme Court "bartered their votes on cases important to the interpretation and jurisprudence of key state constitutional provisions . . . in exchange for state funding desired by the Justices" – specifically, regarding the Pennsylvania Supreme Court's mandate that the General Assembly

---

[2]     Plaintiffs concede that allegations against the Governor are the weakest link in the Complaint, and that the only basis for naming him is the unfavorable inference they draw from the fact that Governor Rendell signed Act 44 within hours of its passage.  See Tr. of Oral Argument, May 19, 2006, at 73:12-14 ("I would agree with regard to the Governor that our argument is at its weakest.  I would have to concede that.").

[3]     The Court notes that only one member of the Pennsylvania Supreme Court – Chief Justice Ralph C. Cappy – has been named as a defendant in this action, and Defendant Cappy is not mentioned specifically in any of these particular allegations of quid pro quo negotiations that allegedly took place in 1999.

fund the Commonwealth's Unified Judicial System.  (Id.)  In sum, Plaintiffs represent that in

Pennsylvania, the "fix is in."[4]

Plaintiffs allege that at some point in the middle of 2004, the Chief Justice of the

Pennsylvania Supreme Court, Defendant Ralph C. Cappy, entered into secret negotiations with

leaders of the Pennsylvania General Assembly and the executive branch to increase the salary of

every justice and judge of the Pennsylvania Unified Judicial System.  (Second Am. Compl. ¶ 45.)

Plaintiffs further allege that Chief Justice Cappy advocated "pegging certain judicial, legislative

and executive branch salaries to the salary, or some fraction thereof, of certain designated federal

officials."  (Id. ¶ 46.)

Contemporaneous with these secret negotiations, on May 3, 2005, House Representatives

Raymond Bunt, Jr. and Michael R. Veon introduced House Bill 1521, Printer's Number ("PN")

1865, a 24-line bill entitled "Relating to Compensation for Executive Branch Officials." House

Bill 1521 proposed to limit the compensation of any member of the Commonwealth's executive

branch or board from receiving compensation greater than that paid to the Governor. (Second

Am. Compl. ¶¶ 56, 57.)

House Bill 1521 was passed by the House,[5] and on July 6, 2005, House Bill 1521, PN-

_____

[4]       See Tr. of Oral Argument, May 19, 2006, at 50:1-6.

[5]       House Bill 1521 was immediately assigned to the House State Government
Committee.  (Id. ¶ 58.)  On June 8, 2005, House Bill 1521, PN-1865, passed the House without
amendment  and on June 13, 2005, the bill was assigned to the Senate State Government
Committee.  (Id. ¶¶ 59, 60.)  On June 30, 2005, House Bill 1521, PN-1865, was passed by the
Senate State Government Committee as reported.  (Id. ¶ 61.)  On July 6, 2005, House Bill 1521
was reported to the Senate Appropriations Committee and amended as House Bill 1521, PN-
2561, a 27-line bill restricting its application to officials elected or appointed to an executive
branch position after November 1, 2006.  (Id. ¶ 62.)

2561, was passed by the Senate with amendments.  (Id. ¶ 63.)  The House refused to concur in

the Senate's amendments, and the Senate insisted upon its amendments to the bill.  (Id.)  After

the House insisted upon its non-concurrence to the amendments, a conference committee was

appointed consisting of three House and three Senate members.  (Id. ¶ 63.)  The appointed

conference committee was comprised of Robert C. Jubilerer, President Pro Tempore of the

Senate; David J. Brightbill, Senate Majority Leader; Robert J. Mellow, Senate Minority Leader;

Samuel H. Smith, House Majority Leader; David G. Argall, House Majority Whip; and Michael

R. Veon, House Minority Whip, all named Defendants in this action.  (Id. ¶ 64.)

At approximately 2:00 a.m. on July 7, 2005, the six-member conference committee

amended House Bill 1521, now PN-2570.  (Id. ¶ 65.)  The amendment converted the bill from its

original 24-line version into a 22-page bill, providing substantial increases in the salary of every

justice and judge of the Pennsylvania Unified Judicial System, every member of the Pennsylvania

General Assembly, and senior members of the executive branch, including the Governor and

members of his Cabinet.  (Id.)  The amendments were so extensive that the original subject

matter of House Bill 1521 was deleted entirely.  (Id. ¶ 66.)

Minutes after being reported out of the conference committee, HB 1521, PN-2570, was

presented to the Senate and the House under a rule prohibiting any amendment to the bill.  (Id. ¶

69.)  Presentation of the bill in this manner represented "the only public consideration of, and the

only opportunity for 247 of the General Assembly's 253 Members to vote on any provision of in

House Bill 1521 as enacted."  (Id. ¶ 70.)  As alleged in the Second Amended Complaint, the

"vast majority" of the General Assembly was given little or no notice of the bill's new subject

matter, nor did they have time to read the statutory language carefully before voting.  (Id. ¶ 73.)

6

The House passed HB 1521, PN-2570, by a vote of 119-79.  (Id. ¶ 73.)  Thereafter, the bill was

passed by the Senate by a vote of 27-23.  (Id. ¶ 74.)  Hours later, the Governor signed HB 1521,

PN-2570, into law as Act 44.

Although the Second Amended Complaint provides little mention of the public outcry

that followed passage of Act 44, on November 16, 2005, following months of sustained critical

news coverage and public pressure, the General Assembly passed the Act of Nov. 16, 2005, P.L.

385, No. 72 ("Act 72") which repealed Act 44 in its entirety.  Plaintiffs do acknowledge that

there was "mounting public opposition" to the pay raise legislation following its passage, and

further assert that when lawmakers voted to repeal Act 44, they were motivated at least in part

"to try to escape public ire[.]"  (Second Am. Compl. at 3, 6.)

## III.    Procedural History

Plaintiffs commenced this action by complaint filed on October 6, 2005 naming as

defendants the Commonwealth of Pennsylvania, Governor Edward G. Rendell, and Treasurer

Robert P. Casey, Jr.  (Doc. No. 1.)  On October 31, 2005, Plaintiffs filed their first amended

complaint, adding the following Defendants: Senate President Pro Tempore Robert Jubilerer;

Representative John M. Perzel; Senate Minority Leader Robert J. Mellow; House Minority

Leader, H. William DeWeese; Senate Majority Leader, David J. Brightbill; House Majority

Leader, Samuel H. Smith; House Majority Whip, David G. Argall; and House Minority Whip,

Michael R. Veon.  (Doc. No. 8.)  Approximately two weeks later, on November 16, 2005, Act 44

was repealed by the Pennsylvania General Assembly.  Upon request of the Commonwealth of

Pennsylvania, the Court convened a telephone status conference on December 6, 2005, to

determine whether Plaintiffs' claims had been rendered moot by the repeal of Act 44.  During

this status conference, Plaintiffs requested and were granted leave to file a second amended complaint within 60 days.  On February 6, 2006, Plaintiff filed the Second Amended Complaint, naming Chief Justice Cappy as an additional defendant, deleting certain portions of the original amended complaint, and adding additional allegations regarding the process by which Act 44 was enacted that allegedly violated Plaintiffs' rights under the United States and Pennsylvania Constitutions.

## IV.   Summary of the Claims Alleged in the Second Amended Complaint

Relying upon the factual allegations summarized above, the Second Amended Complaint advances 13 counts representing separate, but substantially related, legal claims, including the following: (1) a claim alleging conspiracy to violate Plaintiffs' First and Fourteenth Amendment Rights, premised on the allegation that members of the General Assembly passed legislation favored by certain judges who in exchange rendered judicial decisions favorable to the legislature; (2) a claim that the General Assembly violated Plaintiffs' due process rights to a "fair hearing before an impartial tribunal by including in Act 44 a non-severability clause;" (3) a claim that Plaintiffs' due process rights were violated by Defendants engaging in "private conversations on legislative matters with one or more justices of the Pennsylvania Supreme Court that might come before the court;" (4) a claim that the "truncated legislative process" that was allegedly employed in enacting Act 44 represented "a continuing pattern of illegal statutory enactment" that violated Plaintiffs' rights to due process and equal protection; (5) a claim that Plaintiffs' First Amendment right to free speech was violated because they were allegedly prevented from lobbying their elected state representatives prior to passage of Act 44; (6) and eight pendent claims brought under the Pennsylvania Constitution.

**V.      Motions to Dismiss**

Each of the named Defendants have moved to dismiss the Second Amended Complaint in

its entirety.[6]  Although the Defendants have offered varying legal arguments in favor of

dismissal, Defendants argue primarily that this Court lacks jurisdiction to consider Plaintiffs'

claims, and that Plaintiffs lack standing to prosecute this action.  Additionally, Defendants

contend that the General Assembly's repeal of Act 44 has effectively rendered Plaintiffs' claims

moot.  These arguments will be addressed in turn.

**VI.     Discussion**

> **A.      This Action Does Not Present a Justiciable "Case" or "Controversy" Under
>          Article III of the United States Constitution.**

> **1.      Mootness**

It is axiomatic that under Article III, Section 2 of the United States Constitution, federal

courts have authority to adjudicate an action only if it constitutes a justiciable "case" or a

"controversy" that has real consequences for the parties.  U.S. Const. art. I, § 2; Raines v. Byrd,

521 U.S. 811, 818 (1997); Eagle Envtl., L.P. v. Beckman, 237 F.3d 186, 192-93 (3d Cir. 2001).

It is a corollary to this rule that federal courts may not issue advisory opinions where no genuine

case or controversy exists.  Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003) (citations

omitted).  Accordingly, the Legislative Defendants and Governor Rendell have moved to dismiss

this action on the grounds that the repeal of Act 44 by Act 72 has rendered this entire action moot

and therefore non-justiciable in federal court.  Specifically to avoid such a mootness challenge,

---

[6]      Following a hearing held on the motions on May 19, 2006, the Court summarily
dismissed the Commonwealth of Pennsylvania and Treasurer Robert P. Casey, Jr.  (Doc. No.
109.)  Plaintiffs conceded that the Commonwealth was not properly named.  Plaintiffs alleged
absolutely no facts that would support a finding of liability against Treasurer Casey.

Plaintiffs sought leave to amend this action by representing to the Court that their Second

Amended Complaint would allege an ongoing controversy that the Court could consider.

Accordingly, in their Second Amended Complaint, Plaintiffs alleged that Act 72 might be

invalidated by the Pennsylvania Supreme Court at some time in the future, and asserted that their

constitutional challenges relate not just to Act 44, but to the process and manner by which such

legislation came to be considered and enacted by the General Assembly, in concert with members

of the Pennsylvania Supreme Court and the Governor.  Notwithstanding such amendments to

their original action, Plaintiffs continue their call for this Court to declare Act 44 unconstitutional

and that the process by which it was enacted violated Plaintiffs' constitutional rights.

In determining whether it has been presented with a justiciable case or controversy, a

federal district court must resolve questions of mootness before assuming jurisdiction over an

action.  DeFunis v. Odegaard, 416 U.S. 312, 316 (1974).  A case is deemed moot when "[t]he

controversy between the parties has . . . clearly ceased to be 'definite and concrete.'"  Id. at 317

(citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)).  Courts have held that repeal

of a challenged statute renders the challenge moot.  See, e.g., Kremens v. Bartley, 431 U.S. 119,

134 (1977) (Pennsylvania state legislature's repeal of statute governing procedures for voluntary

commitment of juveniles to mental health institutions rendered moot an action challenging the

repealed legislation); Eagle Envtl., 237 F.3d at 192-94 (Congress's action in repealing challenged

statute and replacing it with a different regulatory scheme mooted challenge because declaring

statute unconstitutional or enjoining its enforcement would serve no purpose); Black United

Fund of New Jersey, Inc. v. Kean, 763 F.2d 156, 160 (3d Cir. 1985) (court dismissed as moot

action challenging constitutionality of state statute where statute was repealed and replaced with

new legislation because "[t]he raison d'etre for the injunction no longer exists.").

Courts have held that the mere potential for an unconstitutional law to be reenacted is insufficient to overcome mootness, and instead have held that there must be evidence that the challenged law will likely be reenacted.  See, e.g., Nat'l Black Police Ass'n v. Dist. of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997); Jones v. Temmer, 57 F.3d 921, 923 (10th Cir. 1995) ("Defendants assert that the claims are not moot because the Colorado legislature remains free to reinstate the old law at a later date.  We view this possibility as too conjectural and speculative to avoid a finding of mootness"); Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994) ("a statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed" unless "it is virtually certain that the repealed law will be reenacted"); cf. County of Morris v. Nationalist Movement, 273 F.3d 527, 534 n.4 (3d Cir. 2001) (holding declaratory judgment action moot where challenge focused on a prior municipal statute that was subsequently amended).

In their prayer for relief, Plaintiffs seek, inter alia, entry of orders declaring that Act 44 is "invalid and without any force or effect . . . [and] that the Act itself violates the United States Constitution."  (Doc. No. 23 at 59-60.)  Because Act 44 has been repealed in its entirety, Plaintiffs' claims relating to the Act itself and their prayer that this Court enter orders declaring Act 44 unconstitutional and of no force and effect are moot.  To find otherwise would require this Court to enter an advisory opinion regarding constitutional issues where none is necessary.

Plaintiffs speculate that Act 72, which repealed Act 44, might be invalidated by the Pennsylvania Supreme Court.  Whether or not this happens, however, has no bearing on the present justiciability of Plaintiffs' claims as they are now postured, in light of the fact that Act 44

is no longer operative law.  Plaintiffs have made no such showing that Act 44 is likely to be

reenacted, and the Court therefore finds that the General Assembly's repeal of Act 44 has

rendered moot Plaintiffs' claims calling for the Act to be declared unconstitutional.[7]

Plaintiffs' direct challenge to Act 44 is supplemented in Plaintiffs' Second Amended

Complaint with serious allegations that elected public officials conspired to violate Plaintiffs'

fundamental constitutional rights to free speech and due process in the consideration and

enactment of Act 44.  Plaintiffs claim that even if their challenge to the statute itself is mooted by

Act 44's repeal, they suffered identifiable constitutional deprivations that give rise to a federal

cause of action, and that this cause of action is properly before the court.  These claims raise

fundamental questions regarding whether such claims are legally cognizable and whether

Plaintiffs have the requisite standing to bring this action in federal court.

### 2.    Standing

As Chief Justice Roberts recently wrote, "If a dispute is not a proper case or controversy,

the courts have no business deciding it or expounding the law in the course of doing so."

DaimlerChrysler Corp. v. Cuno, 547 U.S. __, 126 S. Ct. 1854, 164 L. Ed. 2d 589, 601 (2006).

Although vested with vast powers when jurisdiction is properly invoked, federal courts, from

their inception to this day, are courts of limited jurisdiction, empowered to hear only Article III

cases or controversies.  This limitation, carefully crafted to limit the reach of the judiciary into

---

[7]       In their papers and during oral argument, Plaintiffs refer to an element of Act 44 that allowed members of the General Assembly to be reimbursed for unvouchered expenses, thereby enabling the legislators to receive a de facto increase in their compensation prior to the effectiveness of the pay raise in 2006.  Plaintiffs note that the repeal of Act 44 did not require that any disbursements for unvouchered expenses be returned.  Regardless of these allegations, Plaintiffs have not sought any relief with respect to the unvouchered expenses, and the allegations have no bearing on the Court's mootness inquiry.

the affairs of the other branches, maintains a critical balance of power between co-equal branches

of government, and ensures that appointed judges do not usurp the rightful authority of duly

elected representatives of the people.  Thus, Article III defines the authority of the judiciary and

conversely limits access to the courts to those litigants possessed of what courts have come to

term "standing." As the Supreme Court has explained:

> The power to declare the rights of individuals and to measure the
> authority of governments, this Court said 90 years ago, "is
> legitimate only in the last resort, and as a necessity in the
> determination of real, earnest and vital controversy." . . . As an
> incident to the elaboration of this bedrock requirement, this Court
> has always required that a litigant have "standing" to challenge the
> action sought to be adjudicated in the lawsuit.

Valley Forge Christian College v. Americans United for the Separation of Church & State, Inc.,

454 U.S. 464, 471 (1982) (quoting Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339,

345 (1892)).

A court will find Article III standing satisfied only if a plaintiff demonstrates: (1) that it

has suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent,

not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendants; and (3) it is likely, as opposed to merely speculative, that the inquiry will be

redressed by a favorable decision.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992)); see also Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (alleged injury "must be

concrete in both a qualitative and temporal sense.  The complainant must allege an injury to

himself that is distinct and palpable, as opposed to merely abstract.").

Standing operates not to "slam the courthouse door against plaintiffs who are entitled to

full consideration of their claims on the merits,"[8] but to limit the Court's interference into matters properly reserved to other branches of government.  In addition to constitutional requirements, and of particular relevance to the case at bar, the Supreme Court has emphasized that even when a plaintiff has articulated redressable injury, the Court has, due to prudential considerations, "refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches."  Valley Forge, 454 U.S. at 475 (citations omitted) (emphasis added).  In Valley Forge, the Court explained the stark consequences for a plaintiff unable to demonstrate constitutional standing:

> Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States.  Article III, which is every bit as important in its circumspection of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787, a charter which created a general government, provided for the interaction between that government and the governments of the several States, and was later amended so as to either enhance or limit its authority with respect to both States and individuals.

Id. at 475-76 (emphasis added).

In addition to the foregoing considerations, each plaintiff must have standing to sue in their own right.  Sch. Dist. of Phila. v. Pa. Milk Mktg. Bd., 877 F. Supp. 245, 250 (E.D. Pa. 1995).  Additionally, plaintiffs must demonstrate standing separately for each form of relief sought in the action.  See, e.g., Laidlaw, 528 U.S. at 185; City of Los Angeles v. Lyons, 461 U.S.

---

[8]    See Valley Forge, 454 U.S. at 490 (Brennan, J., dissenting) (citation omitted).

95, 109 (1983) (notwithstanding plaintiff's standing to sue for money damages, he lacked

standing to sue for injunctive relief).  Accordingly, the Court will analyze separately below the

standing of the individual Plaintiffs who are before the Court as citizens of the Commonwealth,

the associational standing of Common Cause of Pennsylvania and the League of Women Voters,

and the standing of Representative Greg Vitali.  Finally, the Court will distinguish the case at bar

from other cases in which courts found that plaintiffs possessed standing to sue for specific,

particularized violations of their own constitutional rights resulting from legislative action and

where courts found that they had jurisdiction to grant relief for such harm.

### a.    Citizen Plaintiffs

Four of the Plaintiffs in this action, Tim Potts, Carl Silverman, William Koch, and H.

William McIntyre, are individual residents of the Commonwealth of Pennsylvania and bring this

action only in their capacities as taxpayers who pay taxes into the state's general fund.  (Doc. No.

23, ¶¶ 11-14.)  There are no allegations in the Second Amended Complaint alleging

particularized injury to these individual citizens by either the enactment of Act 44, nor in the

process by which such legislation came to be considered or adopted, nor in the sweeping

allegations of collusion between the Pennsylvania Supreme Court, the General Assembly, and the

Governor which Plaintiffs contend are sufficient to demonstrate due process violations.  Indeed,

in several instances, Plaintiffs essentially concede that their alleged injuries are neither individual

nor particular, but are instead general grievances shared by "the vast majority of the citizens of

the Commonwealth as a class" or "the vast majority of similarly situated citizens of the

Commonwealth" who share an asserted right to "representation in the legislative process of state

government equal to representation of similarly situated citizens represented" by the General

Assembly's leadership. (Second Am. Compl. ¶¶ 89, 90.) Plaintiffs have also cobbled together a due process violation based on the inclusion of a non-severability provision in repealed Act 44 on the theory that because judges cannot be expected to invalidate a nonseverable legislative package that included their own pay raise, Act 44 denies Plaintiffs meaningful access to a fair and impartial tribunal to challenge the legislation within the state judicial system. Plaintiffs further allege a violation of the laws for any constituent of a legislator whose power to draft or debate bills is curtailed by the General Assembly's leadership.

Despite Plaintiffs' protests to the contrary, the foregoing claims are general in nature, shared by many if not all of the taxpaying citizens of the Commonwealth of Pennsylvania, and are at their core political grievances regarding the alleged manner in which Act 44 came to be considered and enacted by the General Assembly. Without even reaching the doubtful question of whether the harms Plaintiffs allege represent cognizable constitutional claims under the facts pled, the Court can only find that these individual Plaintiffs have not demonstrated the sort of individual and concrete harm necessary to invoke the jurisdiction of the federal courts. Equally important, prudential considerations militate strongly against the Court finding standing over claims asserted in this case because they represent "'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475. For all of these reasons, the Court finds that the individual Plaintiffs named above do not possess standing under Article III necessary to maintain this suit in federal court.

### b. Common Cause and the League of Women Voters

In contrast to the standing of individual plaintiffs, an association or organization has

standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Laidlaw, 528 U.S. at 181 (citing Hunt v. Wa. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).  A mere interest in a problem, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected.'"  Schlesinger v. Reservists Comm. to Stop the War, 432 U.S. 333, 343 (1977) (quoting Sierra Club v. Morton, 405 U.S. 727, 739 (1972)).

Plaintiff Common Cause of Pennsylvania alleges that it is a "national non-partisan citizen advocacy organization concerned with advancing integrity in government."  (Second Am. Compl. ¶ 8.)  Its principal goal is "governmental accountability and responsiveness," which it promotes through a variety of activities, including litigation.  (Id.)  Common Cause represents that it has "over 10,000 members in Pennsylvania, most if not all of whom pay taxes into the state's general fund."  (Id.)  Plaintiff League of Women Voters of Pennsylvania is a non-partisan, membership-based, non-profit corporation that seeks "to promote the informed and active participation of citizens in their government."  (Id. ¶ 9.)  The League has historically opposed legislation and procedures "designed to circumvent the constitutional process" and pursues this mission through outreach, education, lobbying, and litigation.  (Id.)  The League represents that most of its members pay taxes into the state's general fund.  (Id.)

Neither Common Cause nor the League alleges that even one of their members has standing to sue in their own right, other than to imply that their members share the constitutional

rights of all Pennsylvanians, and that this action seeks redress for alleged violations of such rights.  The Court has already found that such a generalized claim does not constitute the kind of individual, particularized injury necessary to find standing under Article III.  No matter how sincere or vital to the preservation of an informed electorate, Plaintiff organizations' long-standing interest in the political problems at issue in this case do not operate alone to give them standing to litigate this dispute.  Accordingly, the Court cannot find that either organization or association has the requisite standing to bring this action in federal court.

### c.      Representative Greg Vitali

Plaintiff Greg Vitali is a Member of the Pennsylvania House of Representatives whose 166th state legislative district is within Delaware County, Pennsylvania.[9]  (Id. ¶ 10.)  Plaintiff Vitali alleges that he voted against Act 44.  (Id.)  Plaintiff Vitali further represents that he pays taxes into the Commonwealth's general fund.  (Id.)  Representative Vitali alleges no facts that are unique or held by him personally, and he makes no claim of a deprivation of a personal right such as a claimed right to take his seat with the legislature or to have his vote counted.  Instead, Representative Vitali has merely joined the other Plaintiffs in complaining about the manner in which the legislative leadership of the General Assembly monopolized debate on Act 44, and in describing his claims as implicating the First and Fourteenth Amendments to the United States Constitution.  Thus, Representative Vitali lacks standing for the same reasons that the individual citizen Plaintiffs lack standing.  The fact that Representative Vitali is a member of the General Assembly does not alter the Court's finding, because he has not alleged that as a legislator he

---

[9]      The Court notes that the individual citizen Plaintiffs reside in Dauphin, Lancaster, and Cumberland Counties and are therefore not represented in the General Assembly by Representative Vitali.  (Second Am. Compl. ¶¶ 11-14.)

suffered the sort of concrete and personal harm that is a prerequisite of standing.  Instead, his

claims can be read broadly only as an attack on the actions taken by the General Assembly's

leadership that arguably compromised his power to influence proposed legislation or otherwise

exercise a measure of control over the process by which it was enacted.  The Supreme Court has

expressly rejected the argument that "abstract dilution of institutional legislative power" will be

sufficient to confer Article III standing on a legislative plaintiff.  Raines v. Byrd, 521 U.S. 811,

826 (1997).  Regardless of Plaintiffs' arguments to the contrary, Plaintiff Vitali's claims of injury

as pled do not provide him with standing to litigate this dispute in federal court.

Defendants have advanced the proposition that any Vitali claim would fail because there

exist essentially no circumstances under which a federal court might properly entertain a suit

against state legislative bodies regarding a state legislative matter.  The Court specifically rejects

this view.  In finding that in this action, no Plaintiff, including Representative Vitali, has alleged

the type of individualized harm actionable in federal court, this Court does not countenance the

suggestion that no act of the state legislature undertaken in the conduct of its political business,

no matter how outrageous or blatantly illegal, would trigger federal jurisdiction.

Properly pled, constitutional grievances generated by the legislative processes can rise to

an Article III controversy that may be presented in federal court.  For example, in Bond v. Floyd,

385 U.S. 116 (1966), Julian Bond, a duly elected member of the Georgia House of

Representatives, instituted an action in federal district court seeking injunctive relief and a

declaratory judgment that the state legislature's action of excluding him because of statements he

made criticizing the Vietnam War and the Selective Service laws was an unconstitutional

violation of the First Amendment.  On appeal before the Supreme Court, defendants

19

acknowledged that if the legislature had excluded a legislator on racial or other clearly

unconstitutional grounds that legislator would "be justified in testing the exclusion by federal

constitutional standards," but argued that there should be no judicial review of a state

legislature's power to judge whether a prospective member may conscientiously take an oath of

loyalty required by the State and Federal Constitutions, and apparently argued that Bond's

statements violated that oath.  Id. at 131-32.  The Supreme Court disagreed, holding that the state

legislature was not empowered to use its requirement that its legislators take an oath of office to

prevent legislators from exercising their right under the First Amendment to dissent from

national or state policy, and rejecting the state's argument that it could apply a stricter First

Amendment standard to its members than to the general public.  Id. at 132-34.  In making its

ruling, the Supreme Court necessarily found that plaintiff had standing to assert his rights in

federal court, and that the federal courts were empowered to enter declaratory relief against a

state legislative body found to have violated a member's constitutional rights.

Similarly, in Ammond v. McGahn, a Democratic member of the New Jersey State Senate,

along with certain of her constituents, brought suit under 42 U.S.C. § 1983 against, inter alia,

members of the Democratic Caucus of the New Jersey State Senate, seeking to enjoin the

Caucus's decision to oust her in retaliation for certain public statements that she made.  390 F.

Supp. 655, 657 (D.N.J. 1975).  Ammond alleged that her exclusion from the Caucus violated her

right to free speech; her constituents claimed that the exclusion of their duly elected

representative from the Caucus denied them equal protection under the Fourteenth Amendment.

Id.  The district court initially rejected as "inconceivable" the defendants' argument that they

were cloaked with absolute legislative immunity from suit in federal court and, relying on Bond,

held that the court had jurisdiction to consider plaintiff's claims under 42 U.S.C. § 1983. Id. at 658. Upon consideration of the evidence presented, the district court entered a preliminary injunction despite the uncontested fact that the Caucus had taken action to readmit plaintiff. Id. at 661, 663.

Although the Third Circuit reversed the grant of a preliminary injunction on appeal, its decision was not grounded in a finding that the district court lacked jurisdiction over the claims, nor that Senator Ammond or her constituents lacked standing to prosecute the action in federal court. Instead, the Court found that the record revealed that the Caucus had voted to readmit the plaintiff, and that the evidence did not suggest that the Caucus was likely to exclude plaintiff again in the future. Ammon v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976).[10]

In extremely narrow circumstances, a bare majority of the Supreme Court even found that state legislators had standing to bring a claim in federal court alleging institutional and personal injury where plaintiff state legislators alleged that their votes on a particular matter were actually nullified. See Coleman v. Miller, 307 U.S. 433, 438 (1939); but see Raines v. Byrd, 521 U.S. 811, (1997) (distinguishing Coleman and explaining the especially limited reach of the holding in that case).[11]

---

[10]    The Court did note that the rights of the parties were "far from clear" and expressed some concern about "the possible conflict between the associational and political rights of the Caucus members, as well as plaintiffs' constitutional rights. 532 F.2d at 329.

[11]    In Coleman, the legislative plaintiffs were found to have standing based upon "a plain, direct, and adequate interest in maintaining the effectiveness of their votes." 307 U.S. 433, 438. The Supreme Court has since cautioned that this language of Coleman – which concerned actual allegations of vote nullification – cannot be interpreted to mean that claims regarding "the abstract dilution of institutional legislative power" will be sufficient to satisfy Article III's standing requirements. Byrd, 521 U.S. at 826.

Review of these cases confirms that in actions where plaintiffs have alleged specific

personal harm, including specific constitutional violations caused by or through the conduct of a

state legislative body, federal courts may have jurisdiction to consider a plaintiff's claims and, if

appropriate, enter necessary relief against such a legislative body. These cases are, however,

readily distinguishable from the facts alleged in this case. In <u>Bond</u> and <u>Ammond</u>, legislators and

their individual constituents brought suits alleging specific, particularized instances of action by

state legislative bodies to violate constitutional rights particular to the individual plaintiffs.[12]

These cases do not support a broader proposition, tacitly suggested by Plaintiffs in this case, that

Plaintiffs automatically have standing to allege widespread claims of constitutional violations

relating to the manner in which legislation is drafted, considered, and enacted. Plaintiffs have

affirmed that Representative Vitali does not and cannot allege exclusion or any other individual

violation of a constitutional right. Rather, Representative Vitali joins other Plaintiffs in objecting

to the alleged usurpation of the powers of the elected representatives by a select few of its

members who occupy leadership positions. As <u>Byrd</u> makes clear, these kinds of general

allegations regarding "the abstract dilution of institutional legislative power" are insufficient to

---

[12]     In these cases, the lead plaintiffs were legislators who were joined in their suits by
individual constituents from their legislative districts who claimed that their own constitutional
rights were violated by the injury caused, or alleged to have been caused, their representatives.
As an initial matter, none of the individual citizen Plaintiffs in this case reside in Representative
Vitali's legislative district, and their claims cannot be considered as derivative of constitutional
claims that their individual representatives might have, but did not, advance. Furthermore, the
standing of the citizen plaintiffs in <u>Ammond</u> does not appear to have been challenged, nor was it
the focus of the courts' analysis. Furthermore, in <u>Bond</u>, the district court had dismissed the
complaint as to two of Bond's constituents "because they lacked a sufficiently direct interest in
the controversy as would give them standing." <u>Bond</u>, 385 U.S. at 137 n.14. The Supreme Court
commented that it was "express[ing] no opinion on the question of whether Bond's constituents
can claim that concrete adverseness which would be necessary to give them standing." <u>Id.</u> These
cases thus do not speak clearly on the question of constituent standing.

confer on Representative Vitali standing necessary to bring this action.

For all of the foregoing reasons, the Court finds that none of the Plaintiffs has standing to prosecute this action in federal court, and the matter is therefore non-justiciable and must be dismissed.

**B.      Even if Plaintiffs Had Standing to Bring this Action, They Have Not Asserted Cognizable Federal Claims that Would Entitle Them to Relief in this Court.**

Even were one or more Plaintiffs able to modify their claims to allege individualized harm, they must state a cognizable constitutional claim that would entitle them to relief.  No Plaintiff has done so here.  In reaching this conclusion, the Court again notes that the mere fact that Plaintiffs have alleged constitutional deprivation does not automatically entitle Plaintiffs to present those claims in federal court; rather, it is the specific nature of the rights asserted that determines whether Plaintiffs have stated a recognized constitutional claim.[13]  As the following discussion shows, Plaintiffs have not asserted any rights protected by the United States Constitution or federal law that entitle them to redress in our federal courts.[14]

In Count I of the Second Amended Complaint, Plaintiffs aver that the Defendants engaged in a conspiracy under 42 U.S.C. §§ 1985(3) to deprive Plaintiffs of their federal civil rights. " Id.  In order to maintain an action under 42 U.S.C. § 1985(3), a plaintiff must demonstrate:

---

[13]      See Steel Co. v. Citizens Bank for a Better Env't, 523 U.S. 83, 89 (1998).

[14]      The Court does not reach, and expresses no opinion on, Plaintiffs' claims that the Defendants have violated certain provisions of the Pennsylvania Constitution by the manner and process in which Act 44 was enacted.  Because the Court has found Plaintiffs' claims are non-justiciable and fail to state cognizable federal claims, the Court need not consider Plaintiffs' pendent state claims.

> (a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that the right was consciously targeted and not just incidentally affected.

Plaintiffs meet none of these requirements. Plaintiffs do not allege that any of the Defendants entered into an agreement that consciously targeted, or sought to deprive, any of the Plaintiffs' constitutional rights, nor do Plaintiffs put forth any facts that would support a finding by the court to find that they are members of an identifiable class against whom Defendants conspired to discriminate.

Plaintiffs attempt to circumvent this second hurdle by alleging that they are members of a class of people "denied representation in the legislative process of state government equal to the representation of similarly situated citizens represented by the Leaders [of the General Assembly]." (Second Am. Compl. ¶ 90.) It is well established that such a broad aggregation of citizens does not qualify as a class for purposes of § 1985(3) because "the class 'cannot be defined simply as the group of victims of the [allegedly] tortious action.'" Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269-70 (1993) (quoting United Bhd. of Carpenters & Joiners of Am., Local 610 AFL-CIO v. Scott, 463 U.S. 825, 850 (1983)). The Third Circuit recently held that a putative class that consisted only of alleged constitutional tort victims "cannot serve as a cognizable class within the purview of § 1985(3)." Farber v. City of Paterson, 440 F.3d 131, 138 (3d Cir. 2006). Accordingly, Plaintiffs' failure to plead allegations necessary to support a cognizable claim for conspiracy under § 1985(3) is fatal to Count I of the Second Amended Complaint.

In Count II, Plaintiffs allege that the General Assembly's inclusion of a non-severability

clause in Act 44 infringed Plaintiffs' due process rights by denying them the ability to obtain "a fair hearing before an impartial tribunal." (Second Am. Compl. ¶ 145.) In a nutshell, Plaintiffs are claiming that by attaching a non-severability clause to Act 44, Defendant legislative leaders rendered Act 44 untouchable by the judiciary because by invalidating Act 44, judges would also invalidate their own salary increases. (Second Am. Compl. ¶ 136.) Accordingly, Plaintiffs contend that they have no recourse to the state courts to challenge Act 44, resulting in a violation of their due process rights. Plaintiffs' claim that access to the courts is denied because the state judiciary is incapable of dispassionate review finds no factual or legal support. Although Plaintiffs may prefer a different forum, the doctrine of necessity, long-recognized by Pennsylvania and federal courts, permits the Pennsylvania courts to hear Plaintiffs' claims. The doctrine of necessity provides that a court may decide a case, even though its members have a financial interest, when the claim could not otherwise be reviewed in any court. See United States v. Will, 449 U.S. 200, 215 (1980); see also Philadelphia v. Fox, 64 Pa. 169, 185 (1879) ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest – where no provision is made for calling another in, or where no one else can take his place – it is his duty to hear and decide, however disagreeable it may be."). As these cases make clear, to the extent Plaintiffs have a viable cause of action to challenge Act 44 in state court, the existence of a non-severability clause does not automatically render the case non-justiciable by any judge in the Pennsylvania court system, including the Pennsylvania Supreme Court. State courts have entertained challenges to pay raises in the past, see, e.g., Consumer Party v. Pennsylvania, 507 A.2d 323 (Pa. 1986), and may well do so in the future. Plaintiffs cannot articulate a due process claim simply by alleging that Pennsylvania judges have

25

a financial stake in any review of Act 44.[15]

In Count III, Plaintiffs also claim generally that the process used by Defendants to enact Act 44 violated their due process rights. (Second Am. Compl. ¶ 147.) Although Plaintiffs do not specifically allege that Act 44, before it was repealed, infringed on their life, liberty, or property interests, they appear to be suggesting that they were entitled to receive notice and procedural safeguards before Act 44 was even enacted. As Defendants aptly note, such a claim reflects a misunderstanding of our representative form of government. Plaintiffs are constructively noticed and present for every legislative act of government through their elected representatives. When their representatives are misguided, unresponsive, or ineffectual, they are directly answerable to the people. Absent an actionable claim for institutional exclusions or specific and particular claims of individual harm, as in the narrow circumstances discussed above, Plaintiffs resort is to the ballot box, not the courts.[16]

It is black letter law that there is no actionable constitutional right to due process in the manner in which legislation affecting a broad class of society is enacted. Barefoot v. City of Wilmington, 306 F.3d 113, 124 (4th Cir. 2002) ("When a legislature passes a law which affects a general class of persons, the political process provides all the process that is due."). In a case where the Supreme Court rejected a petitioner's suit to enjoin a state tax commissioner from

---

[15]     Plaintiffs expanded this claim at argument to allege that because Chief Justice Cappy has publicly spoken in favor of the pay raise, no Pennsylvania Supreme Court justice would ever vote against it, making state court review only a formality. See Tr. of Oral Argument, May 19, 2006, at 49:1-6.

[16]     Defendants note that the events that followed Act 44's enactment and quick repeal perfectly illustrate this concept. Defendants Jubilerer and Brightbill recently failed in their reelection bids, as did a sitting justice of the Pennsylvania Supreme Court.

enforcing a tax increase on all taxable property in Denver, Colorado, because the tax was enacted

without a public hearing, Justice Oliver Wendell Holmes explained that:

> Where a rule of conduct applies to more than a few people it is
> impracticable that every one should have a direct voice in its
> adoption.  The Constitution does not require all public acts be done
> in town meeting or on assembly of the whole.  General statutes
> within the state power are passed that affect the person or property
> of individuals, sometimes to the point of ruin, without giving them
> a chance to be heard.  Their rights are protected in the only way
> that they can be in a complex society, by their power, immediate or
> remote, over those who make the rule.

Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915).[17]  See also Rogin v.

Bensalem Twp., 616 F.2d 680, 693 (3d Cir. 1980) ("To provide every person affected by

legislation the various rights encompassed by procedural due process including hearings,

opportunity for confrontation and response, clear standards, an impartial arbiter, and possibly

judicial review would be inconsistent with the structure of our system of government.").

Following these established principles, the Court must find that Plaintiffs have articulated no

cognizable due process violation on the basis that Act 44 was enacted without public hearing.

---

[17]     In reaching this conclusion, the Court distinguished its prior ruling in Londoner v. Denver, 210 U.S. 373 (1908), in which a local board was charging with "determin[ing] 'whether, in what amount, and upon whom' a tax for paving a street should be levied."  Bi-Metallic, 239 U.S. at 445 (explaining Londoner, 210 U.S. at 385).  In Londoner, the Court held that before such taxes could be levied against a small number of people, the affected property owners had a right to a hearing.  Londoner, 210 U.S. at 385 (1908).  The Court in Bi-Metallic distinguished this holding by noting that in Londoner, "[a] relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds, and it was held that they had a right to a hearing. But that decision is far from reaching a general determination dealing only with the principle upon which all the assessments in a county had been laid."  Bi-Metallic, 239 U.S. at 446.  In the case at bar, the challenged legislation applied to the entire Commonwealth of Pennsylvania; accordingly, the rule enunciated in Bi-Metallic is more directly on point and governs Plaintiffs' claims of due process in this action.

In Count IV, Plaintiffs claim that the Defendants violated their right to equal protection under the law by diluting the power and influence of their representatives.  (Second Am. Compl. ¶ 149.)[18]   Plaintiffs argue that the legislative process used to enact Act 44 amounted to an "[e]xercise of power which places certain voters at a disadvantage vis-a-vis other groups of similarly situated voters."  (Doc. No. 103 at 55.)  Thus, Plaintiffs contend that they were denied "equal representation in the entire legislative process of the Commonwealth."  (Id. at 53.)

Plaintiffs rely on Reynolds v. Sims, 377 U.S. 533 (1963) for the proposition that the legislative process at issue in this case caused them to be treated differently from similarly situated Pennsylvania citizens who were represented by members of the General Assembly's leadership in such a way as to support an equal protection claim.  Plaintiffs' reliance on Reynolds is misplaced.  Reynolds recognizes that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.  Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with the votes of citizens living in other parts of the States."  Id. at 568 (emphasis added).  The holding of Reynolds is thus that when a state creates voting districts, it must do so in such way as to ensure, to the extent possible, the one-person, one-vote rule is applied.  As the Senate Leadership correctly notes, Reynolds does not hold that individuals have a right to participate directly in the legislative process, nor does it suggest that every member of a state legislative body is constitutionally entitled to participate equally in drafting, sponsoring, or promoting legislation.

---

[18]      Plaintiffs also include a meritless due process claim in Count IV that is redundant of their claim in Count III.

The Third Circuit rejected a very similar argument in <u>Parker v. Merlino</u>, 646 F.2d 848 (1981).  In <u>Parker</u>, 13 Republican Senators of the New Jersey State Senate and a number of their constituents alleged, <u>inter alia</u>, that the Democratic-controlled Senate's invocation of a parliamentary rule to cut off debate on two bills deprived the Senators' constituents "of their 'right' to 'full and effective' participation in the Senate which is accomplished by the vicarious actions of their representatives,' as well as deprive the plaintiff Senators of their 'right' to 'fully and effectively represent (their) constituents.'"  <u>Parker</u>, 646 F.2d at 855.  The Third Circuit rejected plaintiffs' argument that <u>Reynolds</u> lent support for the proposition that the courts "be protective of the elements of the legislative process, one of which, according to plaintiffs, is 'reasonable' debate on all matters before our legislatures."  <u>Id.</u>  The Court found nothing in <u>Reynolds</u> to hold that failure to allow state legislators reasonable debate in all instances deprived them from fully representing their constituents, and found that their constituents were not deprived of full representation.

As Plaintiffs' claims of equal protection violations are predicated only on allegations of a truncated legislative process with respect to one piece of legislation that was drafted and controlled by the General Assembly's leadership are unavailing, the Court finds they have failed to articulate a cognizable equal protection claim.

Finally, in Count V of the Second Amended Complaint, Plaintiffs allege that the legislative process by which Act 44 was enacted deprived Plaintiffs of their First Amendment right to lobby their legislative representatives about Act 44 before it was enacted.  (Second Am. Compl. ¶ 151.)  It is settled law that no such right exists.  In <u>Minnesota State Board for Community Colleges v. Knight</u>, 465 U.S. 271 (1984), the Supreme Court stated as follows:

> Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted.  Legislatures throughout the Nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received only from a select group. . . . To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices.
>
> ***
>
> However wise or practicable various levels of public participation in various kinds of policy decisions may be, this Court has never held, and nothing in the Constitution suggests it should hold, that government must provide for such participation. . . . Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues.

Id. at 284-85.  Notwithstanding Plaintiffs' firm conviction that their right to petition their representatives regarding Act 44 was infringed by the allegedly secretive and truncated nature of the enactment of Act 44, the above holding from Knight completely disposes of any such claim that Plaintiffs had a right under the First Amendment to petition the General Assembly in advance of the bill's passage other than through their elected representatives.  Accordingly, Plaintiffs' First Amendment claim is facially without merit and must be dismissed.

    **C.**    **Even if Plaintiffs Had Alleged Cognizable Federal Claims, the Court is Without Authority to Grant the Relief Plaintiffs Seek.**

In addition to finding that this action presents a non-justiciable case or controversy and that Plaintiffs have failed to assert cognizable claims under the United States Constitution or federal law, the Court finds further that it lacks legal authority to enter the prospective injunctive and declaratory relief Plaintiffs have requested. In substantive part, Plaintiffs have asked that this Court:

- enjoin the Pennsylvania Supreme Court from citing to or relying on certain of its decisions, and any subsequent case relying upon such decisions, as precedent in future cases challenging legislation as being enacted in violation of the Pennsylvania Constitution;

- declare Act 44 is unconstitutional, invalid, and without any force or effect and enjoin Defendants from enforcing any of its provisions;

- declare that the process by which Act 44 was enacted violated the United States Constitution;

- declare that private conversations on legislative matters that might come before the Pennsylvania courts between members of the judicial and other branches of state government violate the United States and Pennsylvania Constitutions; and

- permanently enjoin Defendants and their successors in office from enacting further legislation in violation of Article III of the Pennsylvania Constitution and by similar means that inhibit and deprive citizens of their right to freedom of political speech.

(Second Am. Compl. at 59-60.)

Plaintiffs' first request can be dismissed out of hand; indeed, it is difficult to believe Plaintiffs could make such a request in good faith. Plaintiffs have not cited, and the Court does not find, any authority that would support this Court entering an order to prevent the highest court of Pennsylvania from relying on its own precedential decisions in future cases. Plaintiffs have not offered any authority for this direct attack upon the sovereignty of the Commonwealth because no such authority exists. Plaintiffs ignore the well-settled principle that a federal district court has no jurisdiction to review a final judgment of a state court. It follows that federal district courts have no jurisdiction to review – much less restrain a state court from relying upon – a final judgment of a state supreme court; only the United States Supreme Court has such authority. Dist. of Columbia Ct. of App. v. Feldman, 460 U.S. 462, 483 n.16 (1983). As the Third Circuit

explained only last year, the <u>Rooker-Feldman</u> doctrine establishes that a federal court has no jurisdiction to grant relief that "would prevent a state court from enforcing its orders."  <u>Knapper v. Bankers Trust Co. (In re Knapper)</u>, 407 F.3d 573, 581 (3d Cir. 2005) (citations omitted).  The Court explained that federal courts lack subject matter jurisdiction over such claims that, if granted, "would reduce the state court judgments to nullities."  <u>Id.</u> at 582; <u>cf.</u> <u>Bush v. Gore</u>, 531 U.S. 98, 142 (2000) ("Federal courts defer to state high courts' interpretation of their state's own law.  This principle reflects the core of federalism, on which all agree.") (Ginsburg, J., dissenting).  Accordingly, the Court has no jurisdiction to grant the relief requested with respect to settled decisions of the Pennsylvania Supreme Court.

The second category of relief requested relates to the alleged unconstitutionality of Act 44.  As has been discussed above, Act 44 has been repealed and is of no further force or effect. Claims relating to the constitutionality of such legislation are therefore moot.  In the absence of such a case or controversy, it is a bedrock principle of constitutional law that federal courts will not have jurisdiction to consider the action, nor to enter an advisory opinion in the matter. Because no actual case or controversy exists with respect to the constitutionality of Act 44, the Court has no power to issue a ruling as to the law's constitutionality.

In their final requests for injunctive and declaratory relief, Plaintiffs ask that this Court enter an order making it unlawful for members of the Commonwealth's various elected branches to confer with one another regarding legislative matters that might possibly come before the Pennsylvania courts.  Additionally, Plaintiffs request that this Court permanently enjoin Defendants and their successors from any future First Amendment violations.  Plaintiffs would have this Court interfere with and superintend the future conduct of elected officials of a

sovereign state in fulfilling the obligations of their respective offices – before such officials have

enacted any legislation or taken any official action.  Plaintiffs' request invites the familiar

admonition: " be careful what you wish for . . ."  Although with respect to a 54% legislative pay

raise or allegations of judicial case-fixing there may be wide agreement on how the Court should

rule, it is unlikely that such ready consensus exists in other matters that will be the subject of

fierce debate and compromise on a daily basis in the halls of our state legislatures in the months

and years ahead.  If the Court accepted Plaintiffs' proposed appointment as permanent overseer

of the Pennsylvania courts and legislature, and undertook to dictate its own solutions to the great

public policy debates of our time, it would surely soon confront the obvious question of by what

authority an appointed official second-guesses the will of the people's elected representatives.

For these very reasons, it is well established that the Court has no power to grant the relief

requested here.  See, e.g., New Orleans Water Works Co. v. City of New Orleans, 164 U.S. 471,

481 (1896) ("[T]he courts will pass that line that separates judicial from legislative authority if by

any order, or in any mode, they assume to control the discretion with which municipal assemblies

are invested when deliberating upon the adoption or rejection of ordinances proposed for their

adoption."); McChord v. Louisville & Nashville R.R. Co., 183 U.S. 483, 495 (1902) ("The fixing

of rates is essentially legislative in its character, and the general rule is that legislative action

cannot be interfered with by injunction."); Assoc. Gen. Contractors of Am. v. City of Columbus,

172 F.3d 411, 415 (6th Cir. 1999) ("[t]he New Orleans Court made clear that the role of the court

is to intervene, if at all, only after a legislative enactment has been passed."); Frison v. United

States, 1995 U.S. App. LEXIS 32544, No. 95-5062, 1995 WL 686224, at *1 (D.C. Cir. Oct. 4,

1995) (unpublished) ("The district court appropriately declined to interfere prospectively with the

exercise of legislative power by the United States Congress."); <u>Alpers v. San Francisco</u>, 32 F.

503 (N.D. Cal. 1887) ("The same exemption from judicial interference applies to all legislative

bodies, so far as their legislative discretion extends. . . . The parties seeking to execute the invalid

act can be reached by the courts, while the legislative body of the State or of the municipality, in

the exercise of its legislative discretion, is beyond their jurisdiction.").

     A separate established principle, also relevant to this case, is that federal courts will not

interfere with a state's distribution of power among its various branches of government.  <u>See,</u>

<u>e.g.</u>, <u>Highland Farms Dairy, Inc. v. Agnew</u>, 300 U.S. 608, 612 (1937) ("How power shall be

distributed by a state among its governmental organs is commonly, if not always, a question for

the state itself."); <u>Prentis v. Atlantic Coast Line Co.</u>, 211 U.S. 210, 225 (1908) ("We shall

assume that when, as here, a state constitution sees fit to unite legislative and judicial powers in a

single hand, there is nothing to hinder so far as the United States Constitution is concerned.");

<u>Montgomery Nat'l Bank v. Clarke</u>, 703 F. Supp. 1161, 1167 (D.N.J. 1989) ("It is well settled that

the division of power among the branches of state government is not a matter of federal

constitutional concern.") (citations omitted).

     Tempting though it may be, the Court has no authority to dictate to the Pennsylvania

General Assembly how that body must conduct itself when considering and enacting future state

legislation, even to enter orders that would restrain Pennsylvania's elected officials from

hypothetically engaging in future conduct that might violate the United States Constitution.

Longstanding constitutional principles absolutely forbid this Court from dictating to

Pennsylvania's current and future elected officials how to distribute power and responsibility for

proposing or developing legislation going forward, much less to enjoin such officials from even

34

discussing potential legislation or other matters of political business with one another in the

course of fulfilling their official responsibilities.

As noted at the outset, to grant the relief Plaintiffs' seek would require that this Court

abandon the modest role of the judiciary carved out by our founders for an activist posture never

intended or authorized, and to ignore over a century of legal precedent.  As Justice Powell wrote

in United States v. Richardson, 418 U.S. 166 (1974):

> The irreplaceable value of the power articulated by Mr. Chief
> Justice Marshall [in Marbury v. Madison, 5 U.S. 137 (1803)] lies
> in the protection it has afforded the constitutional rights and
> liberties of individual citizens and minority groups against
> oppressive or discriminatory government action.  It is this role, not
> some amorphous general supervision of the operations of
> government, that has maintained public esteem for the federal
> courts and has permitted the peaceful coexistence of the
> countermajoritarian implications of judicial review and the
> democratic principles upon which our Federal Government in the
> final analysis rests.

Id. at 192 (Powell, J., concurring).  For better or worse, the matters of which Plaintiffs complain

belong to the political and electoral process.  For over two hundred years, our people have trusted

these processes to restrain their officials from abusing the power of office and making a mockery

of our laws.  It is not for this Court to alter the course of history now.

## VII.   Conclusion

For all of the foregoing reasons discussed in this memorandum, Plaintiffs' Second

Amended Complaint must be dismissed in its entirety.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMON CAUSE OF PENNSYLVANIA,** | : | |
| **et al.,** | : | **Civil Action No. 1:05-CV-2036** |
| | : | |
| **Plaintiffs** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

_____**AND NOW**, this 12th day of June, 2006, upon due consideration, and for the reasons set forth in the within memorandum, **IT IS HEREBY ORDERED THAT** all pending motions to dismiss (Doc. Nos. 54, 80, 82, 85, 87, 90, 92) are **GRANTED** and this action is **DISMISSED**.

     **IT IS FURTHER ORDERED THAT** all remaining motions are **DENIED** as moot. The Clerk of Court shall close the file.


      _s/ Yvette Kane_____
      Yvette Kane
      United States District Judge